Victoria GONZALEZ, on behalf of herself and all others similarly situated, Plaintiff,

v.

DREW INDUSTRIES INC., a Delaware corporation; Kinro, Inc., an Ohio corporation; Kinro Texas Limited Partnership, a Texas limited partnership, d/b/a Better Bath Components; and Skyline Corporation, an Indiana corporation, Defendants.

Case No. CV 06–08233 DDP (JWJx).

United States District Court, C.D. California.

May 10, 2007.

Amanda M. Steiner, Dylan Hughes, Eric H. Gibbs, Matthew B. George, Todd I. Espinosa, Girard Gibbs LLP, San Francisco, CA, John M. Parisi, Shamberg Johnson & Bergman, Kansas City, MO, for Plaintiff.

Jill Pavian Rubin, Nahla B. Rajan, Peter Burr Gelblum, Valentine A. Shalamitski, Mitchell Silberberg and Knupp, Los Angeles, CA, for Defendants.

### ORDER DENYING MOTION TO DISMISS

DEAN D. PREGERSON, District Judge.

This matter comes before the Court on defendants' motion to dismiss the First Amended Complaint ("FAC") for failure to

state a claim upon which relief can be granted. After reviewing the materials submitted by the parties and considering all the arguments therein, the Court denies the motion and adopt the following order.

## I. BACKGROUND

### A. *Factual History*

In November 2005, Victoria Gonzalez, the plaintiff, purchased a manufactured home produced by defendants Skyline Corporation and Skyline Homes. (FAC, ¶ 26.) The home featured a bathtub made of ABS plastic produced by defendants Kinro, Inc., Kinro Texas Limited Partnership, and their parent company, Drew Industries, under the brand name "Better Bath." (*Id.,* ¶ 19.)

Defendants affix two stickers to each ABS bathtub before distributing them; one certifies that the bathtub conforms to ASTM E–162, and the other describes the manufacturer's warranty, and states that the bathtub was "tested for flammability in accordance with HUD Mobile Home Construction and Safety Standards Section 3280.203(a)(6)," and that "test results meet or exceed ASTM E–162 surface flammability of materials using a radiant heat energy source." (*Id.,* ¶¶ 21, 22.)

Defendants Skyline Homes, Inc. and its parent company, Skyline Corporation, produce manufactured homes and install Better Bath ABS bathtubs in those homes. (*Id.,* ¶¶ 9, 10, 26.) To comply with HUD standards, Skyline affixes a "date plate" to each manufactured home it produces to certify that the components comply with applicable HUD standards. (*Id.,* ¶ 23.) Skyline also provides a "Full 15–Month Warranty" to purchasers of its manufactured homes, which states defects in the home will be corrected without charge within a reasonable time. (*Id.,* ¶ 24.)

In her original Complaint, plaintiff alleged that the ABS bathtub in her manufactured home does not meet the Federal flammability standard under 24 C.F.R. § 3280.203(b)(6). (*Id.,* ¶ 28.) On December 27, 2006, plaintiff filed a complaint in this Court, asserting a concealment claim on behalf of a nationwide class and claims under the California Unfair Competition Law and Consumer Legal Remedies Act ("CLRA") on behalf of a California subclass. (Pl.'s Opp'n 4:18–21.) Also, on December 27, 2006, plaintiff served notice on each of defendants of the warranty claims and CLRA claims she intended to assert on behalf of the classes. (*Id.,* 4:21–3.)

On February 15, 2007, plaintiff filed a First Amended Class Action Complaint ("FAC") against defendants, and added claims for violation of the Magnuson–Moss Warranty Act, breach of express warranty, and violation of the Song–Beverly Consumer Warranty Act. (*Id.,* 4:24–7.) Plaintiff added a request for damages under the CLRA, and added defendant Skyline Homes, Inc., a Skyline Corporation subsidiary. (*Id.,* 4:27–5:1.) Based on notices she sent defendants on December 27, 2006, plaintiff alleges in the FAC that she served each of the defendants with notice of the ABS bathtub defect and that they have had "reasonable opportunity to cure the defect, but have failed to do so." (FAC, ¶¶ 54, 61, 64, 79.)

On March 23, 2007, defendants filed a motion to dismiss all claims for relief of the FAC for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II. LEGAL STANDARD

### A. *Motion to Dismiss*

Dismissal under Federal, Rule of Civil Procedure 12(b)(6) is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Newman v. Universal Pictures,* 813 F.2d 1519, 1521–22 (9th Cir.1987). (quoting *Hishon v.*

*King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Accordingly, the Court must "accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 923 (9th Cir.2001). However, the Court need not accept conclusory legal assertions as true. *Benson v. Ariz. State Bd. of Dental Exam'rs,* 673 F.2d 272, 275–76 (9th Cir.1982).

### B. *Preemption*

The origins of preemption are found in the Supremacy Clause of the United States Constitution. U.S. Const. art VI, cl.2. This Constitutional provision explains that the laws of the federal government take precedence over state laws on the same matter and in effect invalidate state laws when they conflict with federal law.

■ The general rule is that federal law does not displace existing state law. Preemption is the exception to this rule. As the Supreme Court in *Michigan Canners & Freezers Ass'n. v. Agricultural Marketing and Bargaining Board,* 467 U.S. 461, 469, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984) noted:

> [f]ederal law may pre-empt state law in any of three ways. First, in enacting the federal law, Congress may explicitly define the extent to which it intends to pre-empt state law Second, even in the absence of express pre-emptive language Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. Finally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible,

or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941)) (balance of citations omitted).

*See also California Federal S. & L. Assn. v. Guerra,* 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987); *Louisiana Public Service Com'n. v. F.C.C.,* 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986); *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984).

There are two main prongs of preemption analysis. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). First, the Court examines the federal statute in question to see if the law contains an express preemption provision. *See id.* Express preemption analysis involves using statutory interpretation techniques to determine the extent of preemption described by the clause. *See Aetna Health Inc. v. Davila,* 542 U.S. 200, 217, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004). If there is no express provision, the Court looks for implied preemption. *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

■ Implied preemption takes two forms: field preemption and conflict preemption. *See Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). In field preemption, a federal regulation is so pervasive that it occupies an entire field and allows for no state action in the area. *English v. Gen. Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Conflict preemption looks at whether the state law makes it either impossible to follow the federal law or provides a significant obstacle to adhering to the federal law. *Freightliner,* 514 U.S. at 287, 115 S.Ct. 1483.

There are also two prongs to conflict preemption analysis: impossibility and obstacle. *Id.* When a state law makes it impossible to comply with a federal law, there is a clear conflict between the two and the state law is preempted. *Id.* The other branch of conflict preemption involves state laws that "prevent or frustrate the accomplishment of a federal objective." *Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 873, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). Federal law thus preempts state law that "stand[s] as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *Id.* (citing *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

The Supreme Court has cautioned, however, that "despite the variety of these opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). "Accordingly, the purpose of Congress is the ultimate touchstone of any preemption analysis." *Cipollone,* 505 U.S. at 516, 112 S.Ct. 2608 (citations omitted).

## III. ANALYSIS

### 1. *Whether Plaintiff's First Amended Class Action Complaint is Preempted by the National Manufactured Housing Construction and Safety Act*

The first issue raised by the parties is whether a class action complaint seeking state law relief for breach of warranty and consumer protection laws is properly brought where violations of a Federal manufactured housing standard gave rise to the alleged breach.[1] Based on the scope of the preemption provisions and the savings clauses of the Act, and the lack of either field or conflict preemption in this case, the Court denies the motion to dismiss plaintiff's first amended complaint.

### A. *Statutory Scheme*

In 1974, Congress enacted the National Manufactured Housing Construction and Safety Standards Act (the "Act") in order to establish a set of national construction and safety standards for manufactured homes. 42 U.S.C. § 5401, *et seq.* (1974). The purpose of the Act, among other things, was "to protect quality, durability, safety, and affordability of manufactured homes; ... to provide for the establishment of practical, uniform, and, to the extent possible, performance-based Federal construction standards for manufactured homes; ... [and] to protect residents of manufactured homes with respect to personal injuries and the amount of insurance costs and property damages in manufactured housing[.]" 42 U.S.C. § 5401(b) (1974). The Act directs the Secretary of the Department of Housing and Urban Development ("HUD") to create regulations imposing "high standards of protection" for manufactured homes and their component parts. 42 U.S.C. § 5403(a)(1) (1974).

HUD standards cover "all equipment and installations in the design, construction, transportation, fire safety, plumbing,

---

1. Although plaintiff brings a cause of action for violation of the Federal Magnuson–Moss Warranty Act, Magnuson–Moss actions may be brought in Federal or State courts. 15 U.S.C. § 2310(d) (1975). The parties have not distinguished the Federal character of Magnuson–Moss from State law for preemption purposes, and, accordingly, the Court declines to do so.

heat-producing and electrical systems of manufactured homes which are designed to be used as dwelling units." 24 C.F.R. § 3280.1(a) (1975). The HUD regulations include a requirement that bathtubs installed in manufactured homes meet certain flammability standards: "finish surfaces of plastic bathtubs ... shall not exceed a flame spread rating of 200." 24 C.F.R. § 3280.203(b)(6) (1984). "Finish surface" refers to the part of the bathtub that is visible after the bathtub is installed. (Pl.'s Opp'n 2:23–5.) The "flame spread rating" measures the amount of heat generated and distance the flame travels down the tested sample. (*Id.* 2:25–7.) All fire testing must be "performed by nationally recognized testing laboratories which have expertise in fire technology." 24 C.F.R. § 3280.209 (1984). The flame spread rating may be determined using the "Standard Test Method for Surface Flammability of Materials Using a radiant Heat Energy Source, ASTM E 162–94." 24 C.F.R. § 3280.203(a) (1984).

Before shipping to distributors and retailers, every manufactured home must be certified by the manufacturer that the home conforms to all applicable HUD construction and safety standards. 42 U.S.C. § 5415 (1975). A "date plate" must be affixed in a permanent manner to each manufactured home to certify that the home complies with HUD standards, including the flame spread rating. 24 C.F.R. § 3280.5 (1977). The HUD regulations provide remedial procedures for defective manufactured homes or components within the homes, including a duty of manufactured home builders to investigate consumer complaints, issue notice where applicable, and, under some circumstances, correct the defect or nonconformity. 24 C.F.R. §§ 3282.402, 3282.404, 3282.406, 3282.409, 3282.410, & 3282.414 (1977). However, "[n]othing in [the HUD] regulations shall limit the rights of the purchaser

under any contract or applicable law." 24 C.F.R. § 3282.402(a) (1977).

## B. *Federal Preemption*

### i. *Express Preemption*

 Under the Act, the presumption against preemption is overcome by an express preemption provision that leaves no doubt of Congressional intent to preempt certain areas of the manufactured housing industry. When Congress enacted the Act, it included an express preemption provision and two "savings" clauses. The preemption provision precludes state and local regulations that impose standards that are not identical to the federal standards:

Supremacy of Federal standards.

Whenever a Federal manufactured home construction and safety standard established under this title [42 U.S.C. §§ 5401 *et seq.*] is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard. Federal preemption under this subsection shall be broadly and liberally construed to ensure that disparate State or local requirements or standards do not affect the uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry as established by this title [42 U.S.C. §§ 5401 *et seq.*]

42 U.S.C. 5403(d) (1974). The Act's preemption clause makes clear Congressional intent to preempt State law in certain areas of manufactured housing, and the

clause also instructs a broad application of the Act's preemptive powers.

The Act's preemption clause gives specific instructions that State law standards are preempted by the Act. The language quoted above focuses on the preemption of any State "*standard* regarding construction or safety . . . which is not identical to the Federal manufactured home construction and safety *standard.*" *Id.* (emphasis added). Furthermore, the language instructing that preemption be. "broadly and liberally construed" is focused on "disparate State or local *requirements or standards*" that "affect the uniformity and comprehensiveness" of the Federal standards. (emphasis added). Although defendants are correct to point out that the word "requirement" has been interpreted by the Supreme Court to include common law claims, *Cipollone,* 505 U.S. at 521, 112 S.Ct. 2608 (1992), the clear language of the statute preempts only those state standards or requirements that differ from the Federal standards promulgated by the Act. *See Turner v. PFS Corp.,* 674 So.2d 60, 63 (Ala.1995) ("only claims that impose different state standards are preempted"); *Macmillan v. Redman Homes, Inc.,* 818 S.W.2d 87, 94 (Tex.App.1991) (the manufactured housing act does not deny the right to bring a lawsuit; it simply denies the right-to allege a theory of liability different from the federal standard); *see also Leipart v. Guardian Indus.,* 234 F.3d 1063, 1068 (9th Cir.2000) (analyzing an analogous statute, the Court found common law a claims premised on violations of requirements identical to the federal standards are not preempted).

Here, plaintiff does not seek to impose standards or requirements that differ from the federal requirements of the Act. Rather, plaintiff seeks to enforce her contractual rights under warranties issued by defendants which guarantee compliance with the federal standard. Thus, not only does plaintiff's action not impose standards or requirements different from the federal regulations in the Act, plaintiff does not even directly enforce the regulations in the Act. The crux of plaintiff's case does not turn on whether the federal regulations were violated, but whether defendants' contractual promises were violated. Thus, the Court finds that the Act has no preemptive effect on plaintiff's claim because the Act states no authority over transactional claims, but rather, speaks to the standard of construction of the homes, themselves. As found by a sister district court, "the only restrictive effect that the NMHCSSA has on a private purchaser asserting a . . . contract claim under state law is that the Act's manufacturing standards are supreme over any standard that state law may impose." *Hammond v. Cappaert Manufactured Hous., Inc.,* 2006 WL 2570537 (W.D.La.2006).

However, defendants highlight the language of the HUD regulations as preempting not only state standards or requirements but also judicial remedies which constitute a "system of enforcement of the Federal standards." (Def.'s Reply, 1:17.) Defendants cite language from the HUD regulations which states:

> These regulations establish the exclusive system for enforcement of the Federal standards. No state may establish or keep in effect through a building code enforcement system or otherwise, procedures or requirements which constitute systems of enforcement of the Federal standards . . . which are outside the system established in these regulations or go beyond this system to require remedial actions which are not required by the Act and these regulations.

24 C.F.R. 3282.11(c) (1977). However, as stated previously, plaintiff does not seek enforcement of the federal standards. Plaintiff seeks enforcement of the contrac-

tual terms she bargained for when she purchased her manufactured home and the components therein from defendants. Specifically, plaintiff seeks to enforce four separate express warranties made to her by defendants.

Moreover, the regulation cited by defendants features its own savings clause, which expressly preserves the right of consumers to bring actions to enforce warranties. "A State may establish or continue in force **consumer protections,** such as **warranty** or **warranty performance requirements,** which respond to individual consumer complaints and so do not constitute a system of enforcement of the Federal standards [.]" *Id.* The clear import of this language is to expressly allow actions such as plaintiff's, which seek merely to remedy the breach of express terms warranted by defendants.

However, defendants protest that the use of the word "individual" in the 3282.11(c) savings clause prohibits class actions because class actions are not "individual" actions, and only an individual action does not constitute "a system of enforcement." (Def.'s Mot. 9:15–9.) However, the Ninth Circuit found that "statutory references to an "individual" has never before been read to preclude class format." *Dukes v. Wal–Mart, Inc.,* 474 F.3d 1214,1241 (9th Cir.2007) (citing *Califano v. Yamasaki,* 442 U.S. 682, 698–99, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). In addition, the language of the savings clause in 3282.11(c) does not readily lend itself to the interpretation that anything other than an "individual" action would constitute a system of enforcement. The language at issue can more readily be read to mean that consumer protections, such as warranties, do not constitute systems of enforcement for the very reasons discussed herein. Warranties do not enforce the Federal standards; they enforce guarantees made by the seller to the buy-

er to induce the buyer to enter the contract. In sum, the Court finds that Congress intended the preemption to extend only to regulations created by states and local authorities that differ from the federal standards, and not to legal claims of private consumers seeking to enforce the federal standards. *See Choate v. Champion Home Builders Co.,* 222 F.3d 788, 793–94 (10th Cir.2000).

This conclusion is reinforced by the two saving clauses contained in 42 U.S.C. § 5409(c) and 42 U.S.C. § 5414(g), which address and explicitly preserve the rights of consumers to file civil actions under the Act.

42 U.S.C. § 5409(c) provides that "[c]ompliance with any Federal manufactured home construction or safety standard issued under this chapter does not exempt any person from any liability under common law." 42 U.S.C. § 5409(c). Addressing a similar preemption argument in *Choate,* 222 F.3d at 793–94, the Tenth Circuit held that the plaintiffs' · products liability claim was not expressly preempted by the Act, nor that the claim was not impliedly preempted by Act. The Court paid special attention to 42 U.S.C. § 5409(c). Relying on the United States Supreme Court's preemption analysis in *Geier,* 529 U.S. at 868–74, 120 S.Ct. 1913, the Tenth Circuit reasoned:

> [t]he saving clause [42 U.S.C. § 5409(c) ] assumes that there are some significant number of common-law liability cases to save. And a reading of the express preemption provision that excludes common-law tort actions gives actual meaning to the saving clause's literal language, while leaving adequate room for state tort law to operate-for example, where federal law creates only a floor, i.e., a minimum safety standard.

*Choate,* 222 F.3d at 793–94. Without the saving clause, the Tenth Circuit reasoned,

a broad reading of the express preemption provision arguably might preempt civil actions, for it is possible to read the preemption provision, standing alone, as applying to standards imposed in common-law tort actions, as well as standards contained in state legislation or regulations. *Id.* Such an interpretation would preempt all non-identical state standards established in tort actions covering the same aspect of performance as an applicable federal standard, even if the federal standard merely established a minimum standard. *Id.* On that broad reading of the preemption clause, little, if any, potential "liability at common law" would remain. And few, if any, state tort actions would remain for the saving clause to save. *Id.* The panel found "no convincing indication that Congress wanted to pre-empt, not only state statutes and regulations, but also common-law tort actions, in such circumstances." *Id.*

Furthermore, within the section of the Act setting forth the notification and correction requirements that HUD may impose on manufacturers, Congress stated that "[n]othing in this section shall limit the rights of the purchaser or any other person under any contract or applicable law." 42 U.S.C. § 5414(g). A plain language reading of this provision reinforces the preemption provision as applying only to state and local regulations.

Applying *Choate*'s analysis to the exact same savings clause, and considering the presence of 42 U.S.C. § 5414(g), the Court finds that the broad reading that defendants ask the Court to adopt cannot be correct. The language of the preemption provision, 42 U.S.C. 5403(d), permits a narrow reading that excludes common law actions. Given the presence of the saving clause, the Court finds that plaintiff's claims are not expressly preempted.

#### ii. *Implied Preemption*

■ Defendants also argue that even if plaintiff's claims are not expressly preempted, they are preempted by implied conflict preemption. In support of this argument, defendants contend that the Act and the HUD regulations constitute a comprehensive regulatory scheme. According to defendants, allowing a state law action to proceed in the face of such a comprehensive scheme would be an obstacle to the accomplishment and execution of the purposes and objectives of Congress when it passed the Act. However, this argument is unpersuasive because defendants do not establish that plaintiff's claims would cause serious interference with the full purposes and objectives of Congress in passing the Act.

■ Implied preemption exists when (1) state law regulates conduct in a field Congress intended the Federal Government to occupy exclusively, or (2) when state law actually conflicts with federal law. *See English,* 496 U.S. at 79, 110 S.Ct. 2270. The Court notes that defendants fail to make clear either in their initial motion or in their reply papers whether they argue that plaintiff's claim should fail because of field preemption or because of conflict preemption.

This Court concurs with the numerous federal and state courts which have held that neither of these types of implied preemption occur when a plaintiff's claims serve to increase compliance with the federal standards mandated by the National Manufactured Housing Construction and Safety Standards Act rather than impose different state standards. *See Turner v. PFS Corp.,* 674 So.2d 60, 63 (Ala.1995) ("[E]nforcing the federal standards through state tort law does not frustrate federal supervision of the industry. The availability of tort claims may serve to increase compliance with the industry.

Thus, only claims that impose different standards. are preempted."); *see also Redman Homes v. Ivy,* 920 S.W.2d 664, 667 (Tex.1996) ("[plaintiffs'] claims do not frustrate Congress's intent in enacting the NMHCSSA, which was to improve% quality and to reduce personal injuries and property damage resulting from accidents involving mobile homes.... To the contrary, state-law consumer protections enforcing such regulations further promote this purpose by encouraging manufacturers to build safe and suitable units."); *see e.g. Shorter v. Champion Home Builders Co.,* 776 F.Supp. 333, 338 (N.D.Ohio 1991) ("The Court cannot find any evidence in the legislative history of the Act that would suggest that a state law claim would frustrate the intent of Congress in reducing personal injuries in mobile homes"); *see Hall v. Fairmont Homes, Inc.,* 105 Ohio App.3d 424, 664 N.E.2d 546, 556 (1995) ("We find that any state common law claim would serve to merely enforce the federal regulations, would not be disruptive of the federal scheme and would further the purpose of the Act of reducing personal injuries.")

As the Tenth Circuit in *Choate* recognized, the Manufactured Housing Act does not support the assertion that Congress intended for the federal government to occupy exclusively the field of construction and safety of manufactured homes. *Choate,* 222 F.3d at 795. Here, as in *Choate,* permitting Gonzalez's claim to go forward would be consistent with the stated purposes of the Act. Congress enacted the Act "to reduce the number of personal injuries and deaths and the amount of insurance costs and property damage resulting from manufactured home accidents and to improve the quality and durability of manufactured homes." 42 U.S.C. § 5401. Nothing in the "Congressional declaration of purposes" found in § 5401 suggests a purpose of providing manufacturers of mobile homes with relief from

potentially higher standards derived from general state products liability law developed by state courts. Accordingly, the claim pursued by plaintiff is intended to increase safety and reduce the number of personal injuries resulting from manufactured home accidents. It would not, as defendants assert, result in an interpretation that would interfere with the purposes and objectives of the Act. Therefore, the Court finds that the plaintiff's First Amended Complaint is not preempted.

## 2. *The CLRA Excludes Manufactured Homes*

■ Defendants also move to dismiss plaintiff's fourth cause of action for a violation of the Consumers Legal Remedies Act ("CLRA"), Cal. Civ.Code § 1750 *et seq.* Of relevance to this case, the CLRA prohibits certain "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ.Code § 1770(a). Plaintiff alleges that defendants violated the CLRA by certifying that ABS Bathtubs complied with flammability standards when in fact they did not, failing to disclose that ABS Bathtubs did not meet the flammability standards as represented, failing to remedy the defect, advertising and causing others to advertise that the bathtubs met the standards. (FAC, ¶ 80). By engaging in this activity, plaintiff asserts, defendants' actions violated the CLRA through the following: (1) misrepresenting the source, sponsorship, approval, or certification of goods or services; (2) representing that goods have approval, characteristics, ingredients, uses or benefits they do not have; (3) representing that goods are of a particular standard, quality, or grade when they are of another; and (4) advertising goods or ser-

vices with intent not to sell them as advertised. *Id.*

Defendants assert that plaintiff's claim under the CLRA fails because manufactured homes are "residences" under the CLRA, and thus are exempt from the coverage of the CLRA. Defendants base this argument on § 1754 of the CLRA, entitled "Exemptions, structures", which states:

> The provisions of this title shall not apply to any transaction which provides for the construction, **sale,** or construction and sale of an entire **residence or all or part of a structure designed for commercial or industrial occupancy, with or without a parcel of real property or an interest therein,** or for the sale of a lot or parcel of real property, including any site preparation incidental to such sale.

Cal. Civ.Code § 1754.

The Court notes that it finds no California or federal authority which has statutorily interpreted § 1754 of the CLRA. Defendants argue that under a plain reading of the statute a manufactured home, despite its movable character, clearly falls within the exemption set forth for "residences ... with or without a parcel of real property or an interest therein...." Plaintiff counters that the CLRA's "real estate exemption" excludes only transactions involving the construction and sale of real property, not manufactured homes, which may be understood to fall within the definition of "goods" under the § 1761(a) of the CLRA. The CLRA defines "goods" as "tangible chattels bought or leased for use primarily for personal, family, or household purposes ... including goods that, at the time of the sale or subsequently, are to be so affixed to real property as to become part of real property, whether or not they are severable from the real property." Civ.Code § 1761(a).

Plaintiff advances two arguments that are useful in arriving at an interpretation of § 1754. First, plaintiff points out that manufactured homes are considered "goods" in many other contexts. The California Uniform Commercial Code § 9102(a)(44) defines "goods" as including "all things that are movable when a security interest attaches." Cal. U. Com.Code § 9102(a)(44). Moreover, "[t]he term includes ... (v) manufactured homes." *Id.* Similarly, several other consumer protection statutes including the Song–Beverly Consumer Warranty Act (Cal. Civ.Code § 1797) and the Magnuson–Moss Warranty Act (15 U.S.C. § 2301(1)) include "manufactured homes" in the definition of a "consumer product."

Secondly, plaintiff argues that defendants' argument that § 1754 encompasses manufactured homes is belied by the real estate exemption found in the Unruh Act, which is identical to the CLRA provision except that it expressly includes "mobile homes" as exempt. Cal. Civ.Code § 1801.4. The two exemption provisions were identical until 1980, when the Legislature amended the Unruh Act exemption to include "mobile homes."

Despite defendants' argument that there was no need for the Legislature to amend the CLRA to include the term "mobile homes" because it was already understood to be part of the normal meaning of "residence" in § 1754, the Court refrains from reading into the CLRA an exception not incorporated by the Legislature. *See Pacific Motor Transport Co. v. State Bd. Of Equalization,* 28 Cal.App.3d 230, 235, 104 Cal.Rptr. 558 (1972) ("Courts may not read into a statute an exception not incorporated therein by the Legislature ... unless such an exception must reasonably and necessarily be implied in order not to disregard or overturn a sound rule of public policy) (internal citations omitted").

Moreover, in § 1760 of the CLRA, the Legislature mandates that courts are to construe the CLRA liberally.[2] Accordingly, in light of the definition of "goods" found in the California Uniform Commercial Code, the distinction between the exemption provisions in the Unruh Act and the CLRA, and the Legislature's explicit instruction to liberally construe the CLRA, the Court refrains to interpret "manufactured homes" as exempted under § 1754. Accordingly, the Court denies defendants' motion to dismiss plaintiff's fourth cause of action under the CLRA.

### 3. The Song–Beverly Cause of Action is Properly Brought

Plaintiff's sixth cause of action alleges a violation of the Song–Beverly Consumer Warranty Act, Cal. Civ.Code § 1790 *et seq.* Based on breaches of both express and implied warranties. Defendants argue that plaintiff's sixth claim for relief fails for two reasons. First, defendants contend that the implied warranty claim fails because plaintiff was not in privity with defendants. Second, defendants assert that the express warranty claim fails because plaintiff's pleading establish that she did not give defendants an opportunity to cure the alleged breach in this case. The Court addresses each of these arguments in turn.

### A. Implied Warranty Claim

■ Vertical privity is a prerequisite in California for recovery on a theory of breach of the implied warranties of fitness and merchantability. *Burr v. Sherwin Williams Co.,* 42 Cal.2d 682, 695–696, 268 P.2d 1041 (1954); *Osborne v. Subaru of America, Inc.,* 198 Cal.App.3d 646, 656, 243 Cal.Rptr. 815 (1988). In this case, Gonzalez admits that she has no contractual relationship with defendants by alleging

that she purchased her manufactured home, already containing the tub, from Skyline, not from any of the defendants. (FAC, ¶¶ 26–27, 93). However, although defendants argue that the implied warranty claims should be dismissed because they have no vertical privity with Gonzalez, this argument ignores the plain language of the Song–Beverly Act, which has been interpreted by a sister district court in this district as explicitly imposing an implied warranty on manufacturers as well as retail sellers.

■ Plaintiff calls the Court's attention to *Gusse v. Damon Corp.,* 470 F.Supp.2d 1110 (C.D.Cal.2007), in which a buyer of a motorhome brought an action against the manufacturer, alleging violations of California's Song–Beverly Consumer Warranty Act. *Id.* Defendants argued the plaintiff's cause of action under the Song–Beverly Consumer Act should be dismissed because of the lack of vertical contractual privity between the parties. *Id.* at 1116 The court rejected this argument and granted summary judgment in favor of the plaintiff. *Id.* at 1118. The court explained that the vertical privity argument "ignores the plain language of the Song–Beverly Act, which defines implied warranties for purposes of a federal Magnuson–Moss Act cause of action." *Id.* at 1116. The Magnuson–Moss Act explicitly states that: "[E]very sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable." *See* Cal. Civ.Code § 1792.

In addition, even were the Court to strictly apply the vertical privity requirement, California law recognizes exceptions

---

**2.** "This title shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to pro-

vide efficient and economical procedures to secure such protection." Cal. Civ.Code. § 1760.

to the privity requirement where there has been reliance on the manufacturer's written representations in labels or advertising. *See Windham at Carmel Mtn. Ranch Assn. v. Super. Ct.,* 109 Cal.App.4th 1162, 1169, 135 Cal.Rptr.2d 834 (2003). As plaintiff points out, this exception is applicable to this case because defendants are alleged to have made misrepresentations to plaintiff with respect to the flame resistance of the ABS Bathtubs. As the Court stated previously, dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Newman v. Universal Pictures,* 813 F.2d 1519, 1521–22 (9th Cir. 1987) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Accordingly, the Court denies defendants' motion to dismiss plaintiff's implied warranty claim under the Song–Beverly Act.

### B. *Express warranty Claim*

Defendants argue that plaintiff did not give defendants notice and an opportunity to cure the alleged defect in her ABS Bathtub prior to removing it, which forecloses her Song–Beverly express warranty claim.

■■■ A plaintiff pursuing an action under the Song–Beverly Act has the burden to prove the following elements: (1) the product had a defect or nonconformity covered by the express warranty; (2) the product was presented to an authorized representative of the manufacturer for repair; and (3) the manufacturer or its representative did not repair the defect or nonconformity after a reasonable number of repair attempts. *Robertson v. Fleetwood Travel Trailers of California, Inc.,* 144 Cal.App.4th 785, 798, 50 Cal.Rptr.3d 731 (2006). Defendants argue that defendants did not have a reasonable opportunity to cure any alleged defect because plaintiff replaced her bathtub prior to notifying the manufacturer of the defect and giving defendants an opportunity to cure prior to filing the original complaint and FAC.

■■■ This argument is unavailing. Plaintiff gave notice of the alleged defect on December 27, 2006, the same date of the filing of the original complaint. It was not until fifty days later, on February 15, 2007, after defendants made no effort to respond to plaintiff's notice, that plaintiff amended her complaint to includes causes of action under the Song–Beverly Act. In her FAC, plaintiff alleges: "Defendants have received notice of the ABS Bathtub defect and have had reasonable opportunity to cure the defect, but have failed to do so." (FAC ¶¶ 54, 61, 64, 79). The Court finds plaintiff's allegations that notice was given to defendants sufficient to withstand a 12(b)(6) dismissal. Any factual disputes concerning the sufficiency of the notice provided would be appropriate on a motion for summary judgment. Accordingly, the Court denies defendants' motion to dismiss plaintiff's express warranty claim under the Song–Beverly Act.

## IV. CONCLUSION

For the foregoing reasons, the Court denies defendants' motion to dismiss plaintiff's First Amended Complaint.

IT IS SO ORDERED.