HALL et al., Appellants and Cross–Appellees,

v.

FAIRMONT HOMES, INC., d.b.a. Friendship Homes,
et al., Appellees and Cross–Appellants.

[Cite as *Hall v. Fairmont Homes, Inc.* (1995), 105 Ohio App.3d 424.]

Court of Appeals of Ohio,
Fourth District, Ross County.

No. 94CA2035.

Decided July 20, 1995.

*Weiss, Kwait & Associates, Steven M. Weiss* and *Cecilia Bonaccio*, for appellants.

*Porter, Wright, Morris & Arthur, James S. Oliphant, Lisa L. Eschleman* and *Ralph Gildehaus*, for appellee and cross-appellant Georgia–Pacific Corporation.

*Squire, Sanders & Dempsey* and *D. Michael Grodhaus*, for appellee and cross-appellant Weyerhaeuser Co., Inc.

*Reminger & Reminger* and *Mark E. Defossez*, for appellee Chesapeake Hardwood Products, Inc.

*Rendigs, Fry, Kiely & Dennis* and *Edward R. Goldman*, for appellee Fairmont Homes, Inc.

STEPHENSON, Judge.

This is an appeal from a judgment of the Ross County Common Pleas Court granting summary judgment to the appellees, Fairmont Homes, Inc., d.b.a. Friendship Homes, a.k.a. Friendship Homes, a Division of Fairmont Homes ("Fairmont"), Georgia–Pacific Corporation ("Georgia–Pacific"), Weyerhaeuser Company ("Weyerhaeuser") and Chesapeake Hardwood Products, Inc. ("Chesa-

peake"). The appellants, Roger and Nancy Hall and their three children Matthew Hall, Amanda Ankrom and Nathaniel Ankrom, assign the following errors:

"I. The trial court erred in finding that appellants knowingly, voluntarily and unreasonably assumed the risk of very severe health problems resulting from appellants' exposure to formaldehyde gas.

"II. The trial court erred in finding that the normal formaldehyde notice which, by law, must be provided to all mobile home purchasers, can be used to charge a particular purchaser with assumption of risk where his mobile home was built with grossly defective formaldehyde-emitting materials.

"III. The trial court erred in imputing the alleged assumption of risk of appellants Roger and Nancy Hall to their minor children.

"IV. The trial court erred in entirely discounting the affidavit testimony of appellants' expert chemist where the expert disclosed the scientific principles which support his opinion but did not disclose the complex chemistry equations on which those chemistry principles are based."

Additionally, appellees Georgia–Pacific and Weyerhaeuser have cross-appealed, contending that if the trial court's grant of summary judgment is reversed on the grounds relied on by the trial court, summary judgment would nevertheless be appropriate because the trial court erred in ruling that the appellants' state law claims were not preempted by federal law.

The following facts are pertinent to this appeal. In March 1991, the appellants began looking for a manufactured home to purchase. According to Mrs. Hall, her visits to sales lots to inspect manufactured homes were marked by peculiar odors and the sensation of burning eyes. These symptoms would appear when she would spend more than just a brief period in a manufactured home. In April 1991, Mrs. Hall spent hours in a manufactured home in a lot in Empire, Ohio, which was the same type of model the appellants eventually purchased. While in the unit, Mrs. Hall experienced a headache and burning eyes, but she assumed it was merely tension. Within twenty minutes of leaving the lot, Mrs. Hall felt like she was choking. At the emergency room, a doctor told her that all of her systems were normal, but that she was having an allergic reaction.

In May 1991, prior to making their purchase decision, the appellants were shown and signed a document entitled "Important Health Notice," which read as follows:

"Some of the building materials used in this home emit formaldehyde. Eye, nose, and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone

with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

"Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

"High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

"If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department."

Mrs. Hall claims that when she signed the document she told the salesperson that she did not know what formaldehyde was. She also claims that the salesperson told her not to worry about the notice, and when Mrs. Hall asked about the ventilation systems, the same salesperson told her that those systems were unnecessary and were not kept in stock. The appellants do admit to seeing notices like the one they signed in display units. Additionally, the homeowner's manual not only contained a notice similar to the one the appellants signed but also contained the following warning:

"If any persons living in your home do not have a sense of well being or have a chronic problem, inadequate air exchange should immediately be suspected and the homeowner should take immediate steps to provide additional air exchanges. Your dealer will be willing to install additional equipment for a reasonable charge if you object to ventilation through cracked windows."

The appellants admit to not reading this particular warning.

The appellants first occupied the home in June 1991. Since moving into the home, the appellants claim to have experienced chronic and severe headaches, fatigue, aching muscles, difficulty breathing, heart palpitations, burning eyes, burning throat and severe nasal congestion. Eventually Mrs. Hall suspected that formaldehyde emissions could be the source of the problem. She contacted the Ohio Department of Health, which sent out a representative to test the air in the home. The representative recommended that an air exchange system be installed, the total cost of which is approximately $4,000. The appellants have not installed this system because they claim they cannot afford it.

The appellants filed this action in September 1992. The appellees in this action eventually consisted of the following: Fairmont, the manufacturer of the home; Georgia–Pacific, the manufacturer of the particleboard flooring in the home; and Weyerhaeuser and Chesapeake, the alleged manufacturers of the wood paneling in the home.

The appellants' second amended complaint alleged product defect, failure to warn, failure to conform to an express representation, breach of express warranty and violation of the Consumer Sales Practices Act, R.C. 1345.01 *et seq.* The appellants retained Dr. Charles Jordan, an analytical chemist. Jordan analyzed samples of particleboard and paneling that were removed from appellants' home. Subsequently, Jordan executed two affidavits which claimed that based on his tests and the amount of decline in formaldehyde emissions over time, at the time of manufacture, the samples tested emitted formaldehyde beyond what is permitted by the Department of Housing and Urban Development ("HUD") under its mobile-home formaldehyde regulation, Section 3280, Title 24, C.F.R.

The appellees filed motions for summary judgment alleging that their products were not defective, that appellants had received timely warnings and that the appellants' claims were preempted by federal law. The trial court granted summary judgment as to all appellees on May 26, 1994. The trial court found that while federal law did not preempt the appellants' action, the appellants could not establish the element of defect and the appellants had assumed the risk. This appeal follows. Additional facts will be discussed as they relate to each assignment of error.

We begin by first setting out the standards for summary judgment. Summary judgment may be granted, according to Civ.R. 56(C), when:

"(1) no genuine issue as to material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

The party moving for summary judgment bears the initial burden of showing there is no genuine issue as to material fact. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46. The moving party's summary judgment motion then "forces the nonmoving party to produce evidence on any issue for which that party bears the burden of proof." *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus.

An order granting a motion for summary judgment will be upheld where, construing the evidence in the most favorable light for the nonmoving party, the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Houk v. Ross* (1973), 34 Ohio St.2d 77, 63 O.O.2d 119, 296 N.E.2d 266. An appellate court therefore applies a *de novo* standard on review. *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 129, 572 N.E.2d 198, 199–200.

We will consider the appellants' fourth assignment of error first, since we find that the resolution of this error dictates the result of the other assignments of error. The appellants submit that the trial court erred in entirely discounting the affidavit testimony of the appellants' expert chemist. In his first affidavit, executed on October 22, 1993, Jordan set forth the following pertinent claims. First, Jordan stated that he has received his doctorate degree in chemistry, and from 1980 to the present he has owned and operated his own company, which is in the business of analytical testing. He further averred that he has conducted hundreds of tests on formaldehyde materials and has done air tests of environments which are suspected of having elevated formaldehyde levels. He stated that he has reviewed all of the major studies which relate to the emission of formaldehyde from particleboard and plywood paneling and the decay rates of these formaldehyde emissions, as well as the effect of temperature and humidity on these emissions. Additionally, he claimed to have personally conducted studies on the effects of time on the emission rates of formaldehyde from particleboard and plywood paneling.

He then stated that on July 21, 1992, he personally performed tests on samples of particleboard and paneling from the appellants' home which led to a result of .11 ppm (parts per million parts of air). He then explained that it was well known that formaldehyde emission rates decline significantly over time and that there were a number of reliable and widely recognized studies which have examined the extent to which formaldehyde emission rates in particleboard and paneling decline over time. He then gave an opinion that the particleboard and paneling in the appellants' home in July 1991 emitted formaldehyde at a rate of .55 ppm at the time of installation in the home. According to Jordan, these values exceeded the HUD .30 ppm limit for particleboard and .20 ppm limit for paneling. Therefore, Jordan concluded that the appellants' mobile home was defective.

Subsequently, Mark Graham, an employee of Georgia–Pacific, executed an affidavit which stated that the testing of the particleboard at the time of manufacture revealed an air chamber formaldehyde level of .07 ppm, which is well below the HUD limit of .30 ppm. On December 17, 1993, Jordan executed

another affidavit which responded to Graham's claims and somewhat clarified his earlier affidavit.

Jordan stated that he had reviewed Graham's affidavit and found that Graham's results did not relate to the particleboard that was installed in the appellants' home or, in the alternative, Graham's results are incorrect. He further concluded that since formaldehyde emissions decline over time and his tests showed a higher emission level a year later than that claimed by Graham at the time of manufacture, Graham's test results were scientifically impossible.

Finally, Jordan reiterated that there were many reliable and widely recognized studies regarding the extent to which formaldehyde emission rates in particleboard decline over time. Jordan also cited one of these studies. He then stated that by applying the data generated in the study he had cited and in his own research, it was his opinion that the particleboard would have tested at .55 ppm at the time of manufacture, which would have violated HUD standards.

The trial court apparently only considered the first affidavit of Jordan, though there is no indication in the record why the supplemental affidavit of Jordan was not considered. In holding that Jordan's initial affidavit did not create a genuine issue of material fact, the trial court set forth the following:

"It is undisputed that the wood products in the manufactured home were stamped as being in compliance with federal regulations at the time they were installed in the manufactured home in 1991. Nonetheless, Plaintiffs dispute that said wood products were within government standards when installed. They offer as support the affidavit of their expert, Charles Jordan, PhD. On July 21, 1992, Jordan measured formaldehyde emission levels from the particle board and paneling and determined that the levels were within federal standards. However, Dr. Jordan went on to offer the opinion that since formaldehyde levels are dynamic and subject to change, at the time the home was purchased in June of 1991, the emission levels greatly exceeded the federal standards. At the time the wood component parts were installed, they were certified as meeting federal standards in all respects. The Court finds that Jordan's affidavit does not create a genuine issue of material fact. Jordan attempts to determine formaldehyde emission levels at a point in time one year prior to his actual testing. It is not disclosed how he specifically measured the rate of decline. Jordan's affidavit is speculative and not based on fact. * * * "

Civ.R. 56(E) sets forth the standards regarding the admissibility of affidavits submitted in either support or opposition of summary judgment. The rule states the following:

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirma-

tively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits. * * * "

The appellees contend that Jordan's affidavit is not sufficient to establish a genuine issue of material fact as to whether the wood products in the appellants' home met federal standards. To better understand the nature of the appellees' argument, it is necessary to explain how the federal regulations function. Pursuant to the National Manufactured Housing Construction and Safety Standards Act of 1974, Section 5401 *et seq.*, Title 42, U.S.Code, HUD established the Manufactured Home Construction and Safety Standards ("MHCSS"), Section 3208 *et seq.*, Title 24, C.F.R., which govern the standards for formaldehyde emissions from materials used in manufactured homes. Section 3280.308(a), Title 24, C.F.R. states the following:

"(a) *Formaldehyde emission levels.* All plywood and particleboard materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes:

"(1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm) * * *.

"(2) Particleboard materials shall not emit formaldehyde in excess of 0.3 ppm * * * "

Additionally, the rule requires that manufacturers of paneling and particleboard participate in the formaldehyde testing program, pursuant to Section 3280.308(b), Title 24, C.F.R. The testing program consists of two separate tests. First, every three months the manufacturer must submit samples to a testing lab, according to Section 3280.308(b), Title 24, C.F.R. Although a manufacturer would ordinarily produce millions of square feet of board in a three-month period, the rule merely requires that a few hundred square feet be tested by a laboratory. This test measures how much formaldehyde is emitted in a large chamber when temperature is limited to seventy-seven degrees and relative humidity is limited to fifty percent, as dictated by Section 3280.308(b)(2), Title 24, C.F.R. It must be noted that this test, as well as all other tests done to measure formaldehyde emissions, is a destructive test, so obviously the materials eventually used in manufactured homes could not be tested.

Second, each manufacturer must maintain a daily quality assurance program, according to Section 3280.308(b)(2), Title 24, C.F.R. Each day the manufacturer must conduct a small-scale, less expensive test at the plant, pursuant to 49 F.R. 32002. The manufacturer must use test methods which "correlate well" with the

quarterly, large chamber test. 49 F.R. 32002. According to the affidavit of Mark Graham, an employee of Georgia–Pacific, these tests are conducted on small samples after one hundred thousand square feet of board have been manufactured.

We must decide by using a *de novo* standard of review whether Dr. Jordan's affidavits satisfy the requirements of Civ.R. 56(E) and, if so, whether they create a genuine issue of material fact as to whether the element of defect could be met. First, we note that we will consider both of Jordan's affidavits since the record shows that both were timely filed and served on all of the required parties, and we can find no indication in the record why the trial court did not consider Jordan's supplemental affidavit.

■ An expert affidavit must set forth the expert's credentials and facts to support the expert's opinion which would be admissible into evidence. *Copper & Brass Sales, Inc. v. Plating Resources, Inc.* (Dec. 9, 1992), Summit App. No. 15563, unreported. None of the appellees dispute Jordan's credentials as an expert, and this court finds that Jordan's credentials as an expert have been adequately presented.

■ In order to be admissible into evidence, an expert opinion must satisfy the requirements of Evid.R. 702, 703 and 705. The version of Evid.R. 702 which was in force when summary judgment was granted in the case *sub judice* is the following:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise."

Appellees have urged this court to consider the new Evid.R. 702 and its effect on the Jordan affidavit since that version of the rule would have been in force had the case gone to trial. While this may be true, this court must only consider the rules which were in force when summary judgment was granted. Jordan's testimony would appear to be scientific and technical knowledge, since most lay people do not understand the intricacies of formaldehyde emission decline rates. Further, it has already been established that Jordan appears to have the necessary credentials to qualify as an expert in this field. Therefore, the last issue left regarding Evid.R. 702 is whether his opinion would assist the trier of fact to understand the evidence or to determine a fact in issue.

The appellees argue that because they complied with all of the testing requirements of HUD, even if Jordan's affidavit establishes that the actual wood in the home did not meet the federal requirements, the appellees would still be entitled to summary judgment. First, the appellees argue that all of the tests

performed on the wood samples pulled during the time of the manufacture of the wood products in the appellants' home satisfied federal requirements. However, Section 3208.308(a), Title 24, C.F.R. states that all plywood and particleboard which is to be installed in manufactured homes must meet the prescribed federal standards. The regulations set forth a separate requirement regarding quality control testing in Section 3208.308(b), Title 24, C.F.R. Therefore, the manufacturers must satisfy both parts of the statute. It is not enough that testing procedures showed no defect. The manufacturers still have an obligation to ensure that no wood products which violate federal standards are put into manufactured homes.

We are aware that since formaldehyde testing is a destructive test, the actual wood installed in the home could not be tested. However, the quality control testing is supposed to ensure that the wood products which are finally sold meet federal requirements. If wood products are being sold which do not meet federal requirements, it can only be assumed that either the testing was not done correctly or the testing procedures even when performed correctly are simply not adequate to ensure that all parts of the statute are satisfied. There is nothing in the federal statutory scheme which suggests that the appellees were prohibited from initiating more stringent quality control testing on their own. The federal guidelines are only minimum requirements. Indeed, even the testimony from Georgia–Pacific's own employee showed that Georgia–Pacific often manufactured materials which tested well below the federal minimum requirements. Therefore, we hold that the conclusions reached in Jordan's affidavit will assist the trier of fact in determining whether the appellees violated Section 3208.308(a), Title 24, C.F.R.

The appellees further argue, however, that even if Jordan's opinion would assist the trier of fact, the affidavit does not set forth facts which would be admissible into evidence. Evid.R. 703 states that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." Also, Evid.R. 705 states that the expert must give his reasons for his opinion and disclose the underlying facts or data. Many of the facts in Jordan's affidavits were perceived by him. For example, he performed the tests on the wood products in the appellants' home personally, and he claimed to have personally conducted his own experiments on the rate of decline of formaldehyde emissions over time. Jordan also based his opinion on facts which were admitted into evidence for the purposes of summary judgment, such as the affidavit of Mark Graham, the employee of Georgia–Pacific.

 Finally, Jordan claimed to have based his opinion on data found in various studies and general scientific principles, such as the fact that formalde-

hyde emissions do decline over time. Appellees argue that this is inadmissible hearsay evidence. Affidavits based on hearsay evidence are not admissible for the purposes of summary judgment. *Pond v. Carey Corp.* (1986), 34 Ohio App.3d 109, 517 N.E.2d 928. However, the reliance on the use of statements of colleagues, textbooks, or lectures generally goes to the expert's qualifications, and is therefore not considered hearsay evidence. See *Bluebird Baking Co. v. McCarthy* (App.1935), 19 Ohio Law Abs. 466, 3 O.O. 490, 36 N.E.2d 801. Therefore, Jordan has not based his affidavits on inadmissible hearsay evidence.

However, the crux of appellees' argument is that Jordan does not set forth exactly how he has calculated what the wood in the appellees' home would have tested one year prior to the tests he personally performed. The appellees do not dispute that formaldehyde emissions do decline over time, but they claim that Jordan has not set forth specific facts which establish how much and over what amount of time formaldehyde emissions decline, and how variables such as temperature and humidity affect this rate of decline.

We find that the failure to disclose the actual chemical equations and calculations which would set out this type of information to be an issue going to the weight of the evidence rather than the admissibility of such. Credibility issues should be left to a jury to decide, not to a court on summary judgment. *Duke v. Sanymetal Products Co.* (1972), 31 Ohio App.2d 78, 60 O.O.2d 171, 286 N.E.2d 324. Therefore we find that Jordan's affidavits satisfy the requirements of Civ.R. 56(E) and establish a genuine issue of material fact as to the element of defect. The appellants' fourth assignment of error is well taken.

We will next consider the appellees' assignment of error on cross-appeal. The appellees submit that the appellants' claims are preempted by federal law. Before we begin our analysis, it should be noted that the appellants are only claiming that they are entitled to relief if they establish that the federal requirements were not met. Therefore, we need not decide whether a state law claim which alleges a product defect despite compliance with federal standards would be preempted by federal law. We only need to decide whether a claim based on noncompliance with federal standards would be preempted by federal law.

Federal law may preempt state law in three ways: (1) when Congress explicitly defines the extent to which it intends to preempt state law; (2) when Congress indicates an intent to occupy an entire field of regulation; and (3) when state law conflicts with federal law and compliance with both laws is impossible. *Michigan Canners v. Agricultural Marketing* (1984), 467 U.S. 461, 469, 104 S.Ct. 2518, 2522–2523, 81 L.Ed.2d 399, 406. Congressional intent may be express or implied and preemption "is compelled whether Congress' command is explicitly

stated in the statute's language or implicitly contained in its structure and purpose." *Sims v. Florida* (C.A.11, 1989), 862 F.2d 1449, 1454.

 Federal regulations, like federal law, also may preempt state action. *Hillsborough Cty. v. Automated Med. Laboratories, Inc.* (1985), 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714, 721. Additionally, it has been held that state tort claims can be just as disruptive as state regulation when an area is subject to an exclusive federal regulatory scheme. *San Diego Bldg. Trades Council v. Garmon* (1959), 359 U.S. 236, 246–247, 79 S.Ct. 773, 780–781, 3 L.Ed.2d 775, 783–785.

 However, the preemption analysis assumes that "the historic police powers of the states [are] not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.* (1947), 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447. In fact, there is a presumption against preemption of state police power regulations. *Cipollone v. Liggett Group, Inc.* (1992), 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407.

 Our analysis therefore begins with looking at the statutory scheme to determine the purpose of the applicable federal law and regulations. In Section 5401, Title 42, U.S.Code, the Manufactured Housing Construction and Safety Standards Act, Congress set forth the following purpose:

"[T]o reduce the number of personal injuries and deaths and the amount of insurance costs and property damage resulting from manufactured home accidents and to improve the quality and durability of manufactured homes."

However, it is clear from looking at the statutory scheme that Congress also intended that the federal regulations be reasonable and considered economic and practical concerns as well as safety. Congress mandated that "each such federal manufactured home standard shall be reasonable and shall meet the highest standard of protection, taking into account existing state and local laws relating to manufactured home safety and construction. Section 5403(a), Title 42, U.S.Code; see, also, *Scurlock v. Lynn Haven* (C.A.11, 1988), 858 F.2d 1521, 1524 ("While consumer protection represents the primary goal of the legislation, complete safety is not to be obtained at all expense: in promulgating regulations HUD must consider the effect of the standards on the cost of mobile homes to the public").

Section 5403(d), Title 42, U.S.Code sets forth the following regarding the supremacy of federal standards:

"Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with

respect to any manufactured home covered, any standard regarding construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard."

Additionally, Section 5409(c), Title 42, U.S.Code states the following regarding common-law liability:

"Compliance with any Federal manufactured home construction or safety standard issued under this chapter does not exempt any person from any liability under common law."

Also, Section 5422(a), Title 42, U.S.Code explains the jurisdiction of a state agency or court under state law:

"Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any manufactured home construction or safety issue with respect to which no Federal manufactured home construction and safety standard has been established pursuant to the provision of section 5403 of this title."

Finally, HUD also stated, "It is HUD's intention that these standards preempt state and local formaldehyde standards in accordance with the Act." 49 F.R. at 31997.

The provisions of the Act explicitly state that states are not allowed to establish regulations or standards which are not identical to those already established under federal law pursuant to the Act. The issue in the case *sub judice*, however, is to what extent does the Act preempt state common-law claims based on violations of the federal regulations themselves. The court in the case that the trial court relied on, *Shorter v. Champion Home Builders Co.* (N.D.Ohio 1991), 776 F.Supp. 333, found that the Act preempts all state standards but not all state claims. The *Shorter* court found that allowing state tort claims furthered the purpose of the Act to reduce personal injuries.

The court in *Macmillan v. Redman Homes, Inc.* (Tex.Ct.App.1991), 818 S.W.2d 87, found that the Act expressly preempted state court jurisdiction to litigate safety issues regarding formaldehyde. The *Macmillan* court reasoned that because Section 5422(a), Title 42, U.S.Code expressly gave state court jurisdiction in matters in which no federal standards had been established, Congress intended that state courts would have no jurisdiction over matters in which federal standards had been established. The *Macmillan* court interpreted Section 5409(c), Title 42, U.S.Code as only allowing common-law claims on matters which no federal standards had been set. In fact, the court interpreted Section 5409(c), Title 42, U.S.Code as evidence that Congress had not meant to preempt the entire field of regulations regarding manufactured homes. However, the court

concluded that Congress had intended to preempt the entire field regarding regulations of formaldehyde emissions.

The underlying facts of the *Macmillan* case are very different from those in the case *sub judice*. In *Macmillan*, the plaintiffs attempted to bring a state law claim under the theory that the ambient air levels of formaldehyde in the manufactured home in question were too high. Since the federal regulations do not set standards for the ambient air levels of formaldehyde in manufactured homes, but rather only for the wood products in the home, the plaintiffs did not allege that the defendants had violated federal standards. In the case at bar, the appellants are alleging violations of federal standards.

Finally, one other court has considered the preemption issue when state regulations were in place which were identical to federal regulations. The court in *Woolridge v. Redman Homes, Inc.* (N.D.Tex.1991), 792 F.Supp. 1469, found that the state claim was not preempted. In *Woolridge*, the plaintiffs sued under a Deceptive Trade Practices Act for fraud and unconscionable acts and breach of duty to warn. The state statute specifically stated that the standards of care in this case had to come from the federal regulations. Since the federal statutory scheme did not offer any remedy for fraud and the court would not be imposing or enforcing any standard other than that promulgated under federal law, the *Woolridge* court found no preemption.

In reviewing the case law and the statutory scheme, this court finds that the appellants' claims are not preempted to the extent that they premise relief on a violation of the federal regulations. We find that any state common-law claim would serve to merely enforce the federal regulations, would not be disruptive of the federal scheme, and would further the purpose of the Act of reducing personal injuries. Section 5403(d), Title 42, U.S.Code only states that no state standard can be established or enforced which is not identical to the federal standards. Additionally, Section 5409(c), Title 42, U.S.Code appears to have common-law claims, regardless of compliance with the federal regulations. Finally, we do not find the *Macmillan* court's interpretation of Section 5422(a), Title 42, U.S.Code to be persuasive or controlling. Accordingly, we overrule appellees' assignment of error on cross-appeal.

In the appellants' first two assignments of error, the appellants submit that the trial court erred by finding that they knowingly, voluntarily and unreasonably assumed the risk because the appellants were provided with the normal formaldehyde notice which, by law, must be provided to all mobile home purchasers. The notice in question is required to be displayed in each manufactured home. Section 3280.309, Title 24, C.F.R. The trial court found that the appellants assumed the risk because the appellants could not establish the element of defect as matter of law, and the notice which had been seen by the appellants before

they purchased the home was adequate to warn the appellants about the dangers of formaldehyde emissions in a home which met federal standards.

This court, however, has found that the appellants produced evidence of the element of defect to defeat summary judgment. The appellants submit that the statutory warning was only intended to warn about manufactured homes which have met federal standards. We agree. There is nothing in the federal regulations to suggest that the warning in question was intended to excuse manufacturers from liability, regardless of whether the federal regulations were followed. The warning provisions were an integral part of the whole regulatory scheme, which was intended to work with the formaldehyde emission restrictions, not in spite of them. HUD stated that it realized that there would still be people who are sensitive to formaldehyde levels lower than those that it set, and therefore it required the health notice to be posted. 49 F.R. at 32000. Therefore, the mandatory warning was designed to alert those people who might still be affected by formaldehyde in a home which has met the federal standards.

Since we have decided that there is a genuine issue of material fact as to whether the materials in the appellants' home met federal standards, we find that there is also a genuine issue of material fact as to whether the warning given was adequate, if the trier of fact concludes that the materials in the appellants' home were defective. Thus, we find that the trial court erred in granting the appellees summary judgment on the grounds that the appellants assumed the risk. The appellants' first and second assignment of error are found well taken.

The appellants' third assignment of error submits that the trial court erred in imputing the assumption of risk of appellants Roger and Nancy Hall to their minor children. Since we have found that the trial court erred in finding that the appellants assumed the risk as a matter of law, we find this assignment of error moot, pursuant to App.R. 12(A)(1)(c).

Accordingly, we reverse the trial court's judgment granting summary judgment to the appellees and affirm the trial court's finding that the appellants' claim was not preempted by federal law. This cause is remanded to the trial court for proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

PETER B. ABELE, P.J., and HARSHA, J., concur as to Assignments of Error Nos. I, II, and III, and as to the cross-appeal, but concur in judgment only as to Assignment of Error No. IV.