OPINION
{¶ 1} This appeal arises from a medical negligence and wrongful death action filed in the Mahoning County Court of Common Pleas by Kathryn Hawks Haney, Administratrix of the Estate of Cheryl E. S. Houser. Appellant filed suit on behalf of her decedent granddaughter against St. Elizabeth Health Center, Mary Ellen Barringer, D.O., Healthridge Medical Center ("Healthridge"), and Hector Gonzalez, D.O. St. Elizabeth Medical Center was dismissed as a defendant and is not a party to the instant appeal. The Mahoning County Court of Common Pleas granted summary judgment to the remaining defendants, primarily on the grounds that Appellant's expert witness was not qualified to testify as an expert and that there was no evidence establishing proximate cause. Contrary to the trial court's conclusion, Appellant's expert, Dr. Friedman, was qualified to provide expert evidence against Appellees Dr. Barringer and Dr. Gonzalez. The record reflects that Appellant sufficiently established the applicable standards of care, breach of the standards of care, and that Appellees may have proximately caused Cheryl Houser's death. Although Appellant did not present evidence establishing the negligence of Appellee Healthridge, there remain questions of fact as to whether Healthridge is liable under the theory of respondeat superior. Therefore, the decisions of the trial court excluding Dr. Friedman as an expert and to grant summary judgment to Appellees are reversed. *Page 3 
 HISTORY OF THE CASE {¶ 2} According to the complaint, Cheryl Houser was taken to the emergency room at St. Elizabeth Health Center on September 11, 2001. Cheryl was complaining of a terrible headache and stiff neck. A cervical spine x-ray was taken. She saw Dr. Barringer, was prescribed ibuprofen and was discharged with the instruction to follow up with her family physician. On September 15, 2001, Cheryl saw Dr. Gonzalez at Healthridge, her primary physician's office. Gonzalez prescribed a muscle relaxer. Appellant asserts that both physicians were advised that Cheryl was suffering from nausea and that she had vomited on the day of her emergency room visit. Neither doctor ordered a CT scan or a spinal tap. On October 8, 2001, Cheryl died as a result of a ruptured berry aneurysm.
 {¶ 3} Appellant alleges in her complaint that Cheryl's pain and suffering and her death could have been prevented had the healthcare providers met their respective standards of care and detected or diagnosed Cheryl's aneurysm. Had this aneurysm been detected, Appellant claims that Cheryl could have had life saving surgery to clip the aneurysm. Appellant claims that Cheryl's death was proximately caused by the defendants' negligence in failing to detect, diagnose, and treat her aneurysm.
 {¶ 4} Appellant originally filed her complaint in September of 2002. The parties pursued discovery, and in May of 2004, Appellees filed their respective motions in limine relative to Appellant's expert witness, Dr. Leslie Friedman. In *Page 4 
response, Appellant filed a notice of voluntary dismissal without prejudice. Appellant subsequently refiled the complaint in the instant matter on June 23, 2004.
 {¶ 5} On September 5, 2006, the trial court granted summary judgment to Appellees. The court determined that Appellant failed to provide evidence of proximate cause through expert testimony. On appeal, Appellant asserts error arising from the trial court's September 13, 2005, January 17, 2006, and September 5, 2006, decisions. The September 13, 2005, Judgment Entry concluded in part that Dr. Friedman was not qualified to testify as an expert against a family practitioner. The January 17, 2006, Judgment Entry granted Appellees' motions in limine regarding Dr. Friedman's, "lack of qualification to offer opinions regarding proximate cause in this case." (1/17/06 Judgment Entry.)
 {¶ 6} Appellant timely raises six assignments of error concerning the trial court's motion in limine rulings and the trial court's alleged failures and bias in this case. The key issue on appeal, though, is whether the trial court properly granted summary judgment to Appellees. Based on the record before us, material issues of fact exist and summary judgment was not appropriate with respect to any of the three Appellees. Therefore, the judgment of the trial court is reversed, and this case is remanded so that it may proceed to trial.
 {¶ 7} The assignments of error will be taken out of order to better serve our analysis.
 ASSIGNMENT OF ERROR NO. 2 *Page 5 {¶ 8} "THE TRIAL COURT ERRED IN RULING THAT APPELLANT NEEDED AN EXPERT WITNESS TO ESTABLISH PROXIMATE CAUSE IN A FAILURE-TO-DIAGNOSE CASE."
 {¶ 9} Although this assignment of error purports to raise an issue involving the elements of a claim that there was a failure to diagnose, the actual argument presented is that Appellant was not required to provide evidence that Appellees proximately caused Cheryl Houser's death because proximate cause is not an element of a claim of lost chance of survival or recovery. Appellant contends that her cause of action was not simply medical malpractice, but rather, malpractice based on the premise that Ms. Houser's chance of survival was reduced by Appellees' conduct. Whether proximate cause is an element of a loss-of-chance malpractice action is a legal question that has a significant bearing on some of Appellant's remaining assignments of error, and thus, we will examine this matter first. An appellate court applies a de novo standard of review to questions of law. Ohio Bell Tel. Co. v. Pub. Util.Comm. (1992), 64 Ohio St.3d 145, 147, 593 N.E.2d 286.
 {¶ 10} Appellant argues that even without proof of proximate cause, a jury may consider whether Appellees diminished Cheryl's chance of surviving her aneurysm. In response, Appellees argue that Appellant is precluded from making this argument now since the argument was not raised in a timely manner in the trial court during the four years the matter was pending. The record indicates though, that Appellant did raise this argument in her September 1, 2006, Supplemental Authority just days prior to the trial court's summary judgment decision. *Page 6 
 {¶ 11} Appellees further argue that Appellant cannot pursue a medical malpractice claim and a loss-of-chance claim because the two claims are mutually exclusive. Some background of the loss-of-chance theory of recovery is necessary to this discussion. In Roberts v. Ohio PermanenteMedical Group, Inc. (1996), 76 Ohio St.3d 483, 668 N.E.2d 480, the Ohio Supreme Court adopted the loss of chance theory in medical malpractice cases, stating:
 {¶ 12} "[T]he `loss of chance' theory, * * * provides an exception to the traditionally strict standard of proving causation in a medical malpractice action. Instead of being required to prove with reasonable probability that defendant's tortious conduct proximately caused injury or death, the plaintiff, who was already suffering from some disease or disorder at the time the malpractice occurred, can recover for his or her `lost chance' even though the possibility of survival or recovery is less than probable." Id. at 485.
 {¶ 13} In Roberts, plaintiff provided evidence that the decedent had a 28% chance of survival if proper medical care had been rendered, and that the defendants' conduct reduced that chance of survival to 0%. The defendants argued that, as a matter of law, the loss of a 28% chance of survival is not a compensable cause of action. The defendants argued that a 28% chance of survival cannot meet the traditional proximate cause standard of reasonable probability, meaning that there was more than a 50% chance that the defendants' actions caused the injury or death. The Roberts Court agreed with plaintiff and explained that, "[t]he rationale underlying the loss-of-chance theory is that traditional notions of proximate causation *Page 7 
may unjustly deprive a plaintiff of recovery in certain cases even where the physician is blatantly at fault; thus, the requirement of proving causation is relaxed to permit recovery. As explained by one court, when a patient is deprived of a chance for recovery, `the health care professional should not be allowed to come in after the fact and allege that the result was inevitable inasmuch as that person put the patient's chance beyond the possibility of realization. Health care providers should not be given the benefit of the uncertainty created by their own negligent conduct. To hold otherwise would in effect allow [health] care providers to evade liability for their negligent actions or in actions * * *.' McKellips v. St. Francis Hosp., Inc. (Okla. 1987), 741 P.2d 467, 474." Id. at 485-486.
 {¶ 14} Although Appellant is correct that the loss-of-chance theory of recovery relaxes, to some extent, the traditional requirements for proving proximate cause, it is clear that the loss-of-chance doctrine is not simply a fallback position when a plaintiff cannot establish proximate cause or has simply failed to address the issue.Roberts held that: "In order to maintain an action for the loss of a less-than-even chance of recovery or survival, the plaintiff must present expert medical testimony showing that the health care provider's negligent act or omission increased the risk of harm to the plaintiff." Id. at 488. Under this holding, the loss-of-chance theory of recovery is actually referred to as the, "loss of a less-than-even chance of recovery or survival." Ohio caselaw does not permit the application of the loss-of-chance doctrine in a case where the injured patient had a greater-than-even chance of recovery at the time of the alleged medical negligence. Id.; McDermott v. Tweel, 151 Ohio App.3d 763, *Page 8 2003-Ohio-885, 786 N.E.2d 67, ¶ 43; Liotta v. Rainey (Nov. 22, 2000), 8th Dist. No. 77396 (refusing to apply the loss of chance doctrine to a case in which the patient had a greater than fifty percent chance of survival when the malpractice occurred).
 {¶ 15} Thus, a medical malpractice plaintiff cannot simply rely on a loss-of-chance theory if some problem arises with respect to proving proximate cause. In effect, the plaintiff must either prove traditional proximate cause, or prove that traditional notions of proximate cause do not apply because the chance of survival or recovery was less than 50% at the time of defendant's negligence. In Roberts, the plaintiff provided evidence that the decedent's chance of survival dropped from 28% to 0% due to the defendants' negligence. In the instant case, there is no such evidence. Appellant has based her proof of liability solely on traditional medical malpractice and traditional notions of proximate cause. Accordingly, this assignment of error lacks merit and is overruled.
 ASSIGNMENT OF ERROR NO. FOUR {¶ 16} "THE TRIAL COURT VIOLATED APPELLANT'S DUE PROCESS RIGHTS AND OHIO CIV.R. 6(D) IN CONSIDERING AND DECIDING A MOTION TO PROHIBIT APPELLANT'S EXPERT NEUROLOGIST FROM TESTIFYING ON THE ISSUE OF PROXIMATE CAUSE WITHIN ONE DAY OF ITS FILING, AND SIMULTANEOUSLY DENYING APPELLANT AN OPPORTUNITY TO EXAMINE AND RESPOND THERETO WITHIN THE TIME PRESCRIBED BY MAHONING COUNTY LOC.R. 4(C)(2)." *Page 9 
 {¶ 17} This argument arises from the trial court's January 17, 2006, Judgment Entry granting Appellees' motions in limine and excluding Dr. Friedman's testimony as to proximate cause and standard of care. Appellant contends that the trial court should have allowed her 14 days to respond to Appellees' motions to exclude Dr. Friedman's testimony. This assignment of error presents a procedural issue that may potentially moot the remaining assignments of error. Therefore, we will deal with this issue before we deal with other, substantive, matters.
 {¶ 18} The judgment entry Appellant is challenging ruled on a motion in limine regarding an expert witness. Motions in limine are, by definition, "prospective and are not dispositive as to the final admissibility of evidence." Wray v. Deters (1996), 111 Ohio App.3d 107,111, 675 N.E.2d 881. A ruling on a motion in limine is an interlocutory ruling that determines the potential admissibility of evidence at trial.Caserta v. Allstate (1983), 14 Ohio App.3d 167, 170, 470 N.E.2d 430. The motions in limine at issue here precluded Appellant from introducing certain evidence at trial. Following a motion in limine ruling, a party must present evidence at trial to preserve error for appellate review.State v. Grubb (1986), 28 Ohio St.3d 199, 203, 503 N.E.2d 142. Since there was no trial in this case, we cannot easily determine what specific impact, if any, the motion in limine might have had on the trial.
 {¶ 19} Regardless, Appellant raises a valid point that the trial court should have granted her 14 days to respond to a defense motion that, in all likelihood, would determine the outcome of trial. Jury trial in this case was scheduled to proceed on January 23, 2006. On January 11, 2006, Appellees Gonzalez and Healthridge faxed *Page 10 
and filed their joint motion in limine seeking to preclude Dr. Friedman from testifying at trial on the standard of care of a family practitioner and as to proximate cause. The motion also sought a conference with the trial court prior to the trial deposition scheduled for Dr. Friedman in Arizona on January 14, 2006.
 {¶ 20} The trial court set a telephone conference for the next day, January 12, 2006, "to discuss the Defendants, Gonzalez and Healthridge's Motion in Limine[.]" The court also indicated that it would not entertain any responses to the motion based on problems the court had with previously faxed motions that were in excess of ten pages. (January 11, 2006, Judgment Entry.)
 {¶ 21} Thereafter, Appellant learned during the telephone conference that Barringer had faxed and filed her own motions in limine on the morning of the January 12, 2006, conference. Barringer likewise sought to exclude Friedman's testimony on the issues of proximate cause and standard of care. The trial court indicated on the record that it had not reviewed Barringer's motions. (Jan. 12, 2006, Telephone Conference Tr., p. 3.)
 {¶ 22} Nonetheless, Barringer was permitted to explain her requests. It was discussed that the trial court had considered Barringer's motion in limine arguments in the previously dismissed case, but it never ruled on these since Appellant dismissed her complaint without prejudice prior to the court's decision. Appellant's counsel indicated that she had responded to Barringer's motion in the original case, but that she had not yet seen the current version of Barringer's motion, nor did she have an opportunity to respond. *Page 11 
 {¶ 23} The trial court allowed counsel to argue the merits of the defense motions. (Jan. 12, 2006, Telephone Conference Tr., pp. 5-15.)
 {¶ 24} Thus, Barringer's arguments were permitted in spite of the fact that Appellant's counsel had no advance warning that they would be addressed at the telephone conference; had less than 24 hours notice that Gonzalez and Healthridge's arguments would be addressed; and had no opportunity to file a written response. The trial court subsequently granted all of the motions in limine and excluded Friedman's testimony as to standard of care and as to the proximate cause of the decedent's death.
 {¶ 25} Based on this record, Appellant should have been given more time to respond to this highly unusual set of circumstances involving evidentiary motions that would, in all likelihood, determine whether the case could proceed to trial. Mahoning County Local Rule 4(C), provides in part,
 {¶ 26} "All motions and briefs shall be filed with the Clerk of Courts. * * *
 {¶ 27} "* * *
 {¶ 28} "Opposition briefs shall be filed no later than fourteen (14) days from the date of filing of a motion unless, with leave of Court, an extension is granted. Motions may be heard and ruled upon the day following the cut-off for filing briefs."
 {¶ 29} The Ohio Supreme Court, in Hillabrand v. Drypers Corp. (2000),87 Ohio St.3d 517, 519, 721 N.E.2d 1029, held that a trial court abuses its discretion when it fails to abide by its local rules regarding response times for a party to file an opposing motion. InHillabrand, the trial court granted the defendant's motion to *Page 12 
dismiss the plaintiffs case with prejudice for his failure to comply with discovery requests.On appeal, the Ohio Supreme Court overturned the decision because the plaintiff did not have an opportunity to file a written response before the motion was granted, noting that the trial court granted the motion to dismiss just two days after it was filed and on the same date that Hillabrand received his copy of the motion. TheHillabrand Court concluded that a reasonable time to respond is the, "time frame allowed by the procedural rules of the court." Id. at 520.
 {¶ 30} Based on the foregoing, it appears that the trial court's ruling on the motions in limine acted, in part, to exclude evidence from consideration in summary judgment and formed the basis of the court's final judgment. In this respect, the ruling was no longer interlocutory and is reviewable on appeal, at least with respect to summary judgment proceedings. The mere conclusion, though, that there was a procedural error does not automatically mean that there was reversible error. Since our review of summary judgment is de novo, we are not bound by the trial court's rejection of the evidence that Appellant submitted in order to avoid summary judgment. On review, we examine the entire record, including all of the evidence that Appellant submitted, and any arguments that she intended to make to the trial court. Because this is the case, we will move on to the relevant assignments of error so that we may undertake this review.
 ASSIGNMENT OF ERROR NO. ONE {¶ 31} "THE TRIAL COURT ERRED IN ITS SEPTEMBER 6, 2006 ORDER PRECLUDING APPELLANT'S EXPERT NEUROLOGIST FROM TESTIFYING AS *Page 13 
TO WHETHER THE DEVIATIONS FROM THE STANDARD OF CARE APPLICABLE TO EACH APPELLEE PHYSICIAN WERE EACH A PROXIMATE CAUSE IN THE DEATH OF THE DECEDENT.
 ASSIGNMENT OF ERROR NO. THREE {¶ 32} "THE TRIAL COURT ERRED IN PRECLUDING APPELLANT'S EXPERT NEUROLOGIST FROM TESTIFYING AGAINST APPELLEES GONZALEZ AND HEALTHRIDGE MEDICAL CENTER ON GENERAL GROUNDS THAT A NEUROLOGIST IS NOT QUALIFIED TO TESTIFY AS AN EXPERT AGAINST A FAMILY PRACTITIONER."
 {¶ 33} In these two assignments of error Appellant claims, in part, that her expert witness, Dr. Friedman, was qualified to testify as an expert and that he provided sufficient evidence of the standard of care and proximate cause to overcome summary judgment. A trial court's ruling on a motion for summary judgment is reviewed de novo on appeal, using the same standards as the trial court as set forth in Civ.R. 56(C).Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105,671 N.E.2d 241. Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. Temple v. Wean United,Inc. (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267. *Page 14 
 {¶ 34} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifyingthose portions of the record which demonstrate the absence of a genuineissue of fact on a material element of the nonmoving party'sclaim." (Emphasis sic.) Dresher v. Burt (1996), 75 Ohio St.3d 280, 296,662 N.E.2d 264.
 {¶ 35} Expert evidence that is submitted to overcome a defense motion for summary judgment must meet the requirements of Civ.R. 56(E) and Evid.R. 702. Douglass v. Salem Community Hosp., 153 Ohio App.3d 350,2003-Ohio-4006, 794 N.E.2d 107, ¶ 21. In order to comply with these rules, an expert's affidavit, and any further supporting testimony or documentation, must set forth the expert's credentials and the facts supporting the expert's opinion. Hall v. Fairmont Homes, Inc. (1995),105 Ohio App.3d 424, 434, 664 N.E.2d 546.
 {¶ 36} On appeal, Appellant argues that the trial court erred in finding that Dr. Friedman was unable to testify as an expert in medical malpractice regarding a family physician and an emergency room doctor. Three elements must be proven in order to maintain a medical malpractice or professional negligence cause of action. First, a plaintiff must establish the applicable standard of care recognized by the medical community, usually through expert testimony. Second, a plaintiff must show a negligent failure on the part of the physician or hospital to meet the standard of care. Finally, a direct causal connection must be demonstrated between the medically negligent act and the injury.Starkey v. St. Rita's Med. Ctr. (1997), 117 Ohio App.3d 164,690 N.E.2d 57; Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, 346 N.E.2d 673. *Page 15 
 {¶ 37} The Ohio Supreme Court has held that an expert witness does not have to be the best witness on the subject. Ishler v. Miller (1978),56 Ohio St.2d 447, 453, 384 N.E.2d 296. Instead, the test is whether the witness will assist the trier of fact in the search for the truth. Id.
 {¶ 38} In Hudson v. Arias (1995), 106 Ohio App.3d 724, 667 N.E.2d 50, the Eighth District Court of Appeals explained the general rule for expert medical witnesses, stating that: "the witness must demonstrate a knowledge of the standards of the school and specialty, if any, of the defendant physician which is sufficient to enable him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards and not to the standards of the witness' school and or specialty if it differs from that of the defendant. Thus it is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of his qualifications." (Emphasis and citations omitted.) Id. at 729.
 {¶ 39} The Ohio Supreme Court has also held that, "[w]here * * * the fields of medicine overlap and more than one type of specialist may perform the treatment, a witness may qualify as an expert even though he does not practice the same specialty as the defendant." Alexander v. Mt.Carmel Medical Center (1978), 56 Ohio St.2d 155, 158, 383 N.E.2d 564.
 {¶ 40} It has also been held that all practitioners who perform certain medical procedures are subject to the same standard of care.King v. LaKamp (1988), 50 Ohio App.3d 84, 553 N.E.2d 701, syllabus. The standard is not dependent upon a *Page 16 
practitioner's specialty. Instead, differences in specialization go to the weight of the evidence for the jury's consideration. Id.
 {¶ 41} In addition to the applicable standards of care, Appellant was also required to prove proximate cause. The general rule in medical malpractice cases is that the plaintiff proves causation through medical expert testimony by establishing the probability that the injury was, more likely than not, caused by the defendant's negligence.Roberts, supra, 76 Ohio St.3d 483, 668 N.E.2d 480.
 {¶ 42} "The admissibility of expert testimony that an event is the proximate cause is contingent upon the expression of an opinion by the expert with respect to the causative event in terms of probability."Stinson v. England (1994), 69 Ohio St.3d 451, 633 N.E.2d 532, paragraph one of the syllabus. Probability has been defined as "more likely than not" or a greater than fifty percent chance. Miller v. Paulson (1994),97 Ohio App.3d 217, 222, 646 N.E.2d 521.
 {¶ 43} Further, no specific words are required as to probability, "only that the medical expert opinion must be to the effect that the negligence probably was a proximate cause of the subsequent injury."Dellenbach v. Robinson (1993), 95 Ohio App.3d 358, 373, 642 N.E.2d 638.
 {¶ 44} Thus, in order to overcome a defense motion for summary judgment in a medical malpractice case, the plaintiff must submit expert evidence in the form of an affidavit, or some other form applicable to summary judgment proceedings, establishing that the expert is familiar with the standards of care applicable to each defendant, that the standard of care was breached, and that the defendants *Page 17 
proximately caused the injury or death. In this case, there were three remaining defendants with three possibly separate standards of care: Dr. Barringer (an emergency room doctor), Dr. Gonzalez (a family physician), and Healthridge (a medical center allegedly employing Dr. Gonzalez).
 {¶ 45} At this juncture, we must point out that Appellant has failed to set forth evidence respecting a breach of any separate standard of care which would be applicable to Appellee Healthridge. Appellant's argument is that the expert evidence provided by Dr. Friedman relates to the standards of care of Dr. Barringer and Dr. Gonzalez, only. Although Appellant does mention Healthridge occasionally in passing in this appeal, we find nothing in the record describing any separate standard of care that would apply to a hospital or medical center such as Healthridge.
 {¶ 46} Healthridge contends that without such evidence, Appellant has failed to establish any factual dispute and that summary judgment, at least for it, was appropriate. Appellant's complaint, though, may be read to allege that Healthridge is liable not for its own separate negligence, but rather, is secondarily liable under the theory of respondeat superior. It is well-established in Ohio that, "[u]nder the doctrine of respondeat superior, a hospital is liable for the negligent acts of its employees." Berdyck v. Shinde (1993), 66 Ohio St.3d 573,578, 613 N.E.2d 1014. This doctrine applies whether the employee's actions are administrative or medical. Klema v. St. Elizabeth's Hospitalof Youngstown (1960), 170 Ohio St. 519, 166 N.E.2d 765, paragraph two of the syllabus. The relevant questions in applying the doctrine of respondeat superior are: (1) whether the person who committed the negligent act *Page 18 
was an employee of the hospital; and (2), if he or she was an employee, whether the act committed was within the scope of his employment. Id. at 527. The issue of respondeat superior was not resolved in the various motions for summary judgment. Because the trial court's decision to grant summary judgment to Dr. Gonzalez is reversed, and since Dr. Gonzalez is alleged to be an employee of Healthridge, we must also reverse the trial court decision with respect to Healthridge to the extent that it may be subject to liability in respondeat superior.
 {¶ 47} The evidence reflects that Dr. Friedman provided sufficient evidence of his qualifications, as well as knowledge of the applicable standards of care and proximate cause, to overcome Appellees' motions for summary judgment. At deposition, Dr. Friedman testified he was a practicing neurologist for 23 years, licensed in Ohio, Indiana and Arizona. He teaches and supervises neurology residents at the Barrow Neurological Institute. He was a clinical instructor in the Department of Neurology at Ohio State University. He was Chief of Medicine at St. Ann's Hospital in Westerville, Ohio. He testified that, as part of his practice, he was familiar with the symptoms, diagnosis and treatment of berry aneurysms. (1/14/06 Deposition, pp. 7-15.)
 {¶ 48} In Dr. Friedman's May 26, 2004, affidavit, he stated in part,
 {¶ 49} "I successfully completed my rotation within an emergency room as part of my training as a physician, I have worked for over 20 years with emergency room physicians and family physicians in evaluation of patients and diagnosis on a daily *Page 19 
basis. I interact with emergency room physicians on a daily basis as part of my professional practice." (May 26, 2004, Affidavit of Dr. Leslie Friedman, ¶ 5.)
 {¶ 50} In his affidavit he also states:
 {¶ 51} "As far as the specific set of circumstances and facts underlying the claims against the emergency room physician in this case, the standard of care for assessing the decedent's headache, which was severe enough to bring her to the emergency room on September 11, 2001, is no different than the standard that would be applicable to a neurosurgeon or a neurologist. There is sufficient overlap in the proper treatment and diagnosis of a patient presenting the symptoms presented by the decedent for a neurologist to testify to the standard of care applicable to an emergency room physician.
 {¶ 52} "* * *
 {¶ 53} "Based upon my review of the [evidence] * * *, I am of the opinion, to a reasonable degree of medical certainty, that the emergency room physician and family physician's treatment and diagnosis of Cheryl Houser was beneath the applicable standards of care, and were each a proximate cause of her death." (May 26, 2004, Affidavit of Dr. Leslie Friedman, ¶ 6, 8.)
 {¶ 54} Dr. Friedman explained in his January 14, 2006, deposition that he believed the actions of the emergency room doctor in this case, Dr. Barringer, fell below the standard of care because she failed to order an MRI or a CT scan. Dr. Friedman also believed that the family physician in this case, Dr. Gonzalez, acted below the standard of care in failing to review or even request the decedent's medical *Page 20 
records from the hospital and in failing to order a CT scan or MRI. (Friedman Depo., pp. 42-43, 48-49, 54.)
 {¶ 55} Although Appellees argue that Dr. Friedman never discussed proximate cause in his medical reports or his deposition testimony, he did give his professional opinion regarding proximate cause in an affidavit submitted to overcome summary judgment. This is an acceptable form of evidence in summary judgment proceedings. Civ.R. 56(C).
 {¶ 56} Appellee, Dr. Barringer argues that Dr. Friedman could not provide the morbidity and mortality statistics relative to the procedure to clip an aneurysm in this type of case. Dr. Barringer also argued that Dr. Friedman's ability to look up the statistics was of no consequence: that his lack of knowledge of these statistics should disqualify him as an expert. (Jan. 12, 2006, Tr., pp. 17-19.) We disagree with Dr. Barringer's argument. Dr. Friedman's inability to quote a particular statistic is not dispositive of his qualifications as an expert. An expert witness is permitted to rely on statistical conclusions, but is not required to do so, unless of course the expert is testifying specifically as an expert in statistical analysis. State v. Foust,105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 85. Dr. Friedman's ability to quote statistical tables goes to the weight and credibility of his testimony, and not to the sufficiency of his qualifications as an expert. Id.
 {¶ 57} Dr. Friedman's February 8, 2006 affidavit states in part:
 {¶ 58} "5. * * * [T]here is a statistical morbidity and mortality rate associated with surgical intervention in the case of Cheryl Houser, a 15-year old girl who *Page 21 
ultimately died from a ruptured berry aneurysm on October 8, 2001. There is a higher statistical rate of morbidity and mortality when one does not surgically intervene in reference to an aneurysm that has leaked.
 {¶ 59} "6. During my deposition, I was asked whether I knew what the rate was, to which I responded that while I did not have the rate memorized, I could ascertain the rate within three (3) minutes. * * *"
 {¶ 60} "7. * * * I was not given 3 minutes to obtain the answer [sic] the precise statistical data on specific morbidity and mortality questions.
 {¶ 61} "8. Moreover, my testimony also unequivocally confirmed that Cheryl Houser would have been better off having surgery to clip the aneurysm than simply leaving it alone. * * *"
 {¶ 62} "* * *
 {¶ 63} "10. * * * the information [statistics] was ascertainable by any physician within a few minutes, the information or resources to ascertain the precise statistic are widely known by neurologists, and neurosurgeons are not the only physicians who have access or require use of this information."
 {¶ 64} "11. Furthermore, the morbidity and mortality statistics vary depending upon several diagnostic and clinical factors. This requires some history and explanation in order to appreciate the distinctions." (February 8, 2006, Affidavit of Dr. Leslie Friedman.)
 {¶ 65} Thereafter, Dr. Friedman provides 19 paragraphs of analysis in assessing the mortality and morbidity rates for someone with Cheryl's symptoms, in a *Page 22 
similar condition, of a similar age, and similar health. Friedman concluded that Cheryl had a greater prognosis of recovery with surgery than without, and that her, "sentinel leak could have been detected through use of CAT scan * * * [or] through use of a lumbar puncture (spinal tap) * * *." (February 8, 2006, Affidavit of Dr. Leslie Friedman ¶ 12-36.)
 {¶ 66} Based on the record, then, we conclude that the trial court erred in excluding Dr. Friedman's testimony on the issues of standard of care and proximate cause. Dr. Friedman testified that the standard for assessing patients who present with Cheryl's alleged symptoms, e.g., headache, neck stiffness, nausea, etc., was the same for neurologists, family practitioners, and emergency room doctors. Dr. Friedman also stated with certainty that both physicians in this case failed to meet that standard when they failed to order a CT scan, MRI, or a spinal tap. Further, Friedman unequivocally stated in his May 26, 2004, affidavit, that the Appellees' failures to meet the applicable standards of care proximately caused the decedent's death. He stated, "to a reasonable degree of medical certainty, the risk of serious injury or death to Cheryl Houser without surgery in September/October 2001 was greater than the risks associated with surgery to clip her aneurysm." Further, "the failure to diagnose Cheryl Houser's sentinel leak on each of September 11, 2001 and September 15, 2001 was a proximate cause of her ultimate death[.]" (February 8, 2006, Affidavit of Dr. Leslie Friedman ¶ 28, 36.)
 {¶ 67} Accordingly, the evidence reflects that Dr. Friedman was qualified to present expert testimony regarding standard of care and proximate cause, and that *Page 23 
he presented sufficient evidence to, at least, avoid a defense motion for summary judgment. Therefore, Appellant's first and third assignments of error are sustained. Based on the above, any error pursuant to assignment number four has been cured.
 ASSIGNMENTS OF ERROR FIVE AND SIX {¶ 68} "THE TRIAL COURT'S DECEMBER 22, 2005 FINDINGS OF FACT RELATING TO WHY APPELLANT VOLUNTARILY DISMISSED HER INITIALLY-FILED COMPLAINT, ITS STATEMENTS CONCERNING APPELLANT'S ABILITY TO SEEK A REMEDY AGAINST HER OWN COUNSEL WERE NOT SUPPORTED BY FACTS IN THE RECORD AND WERE IMPROPER.
 {¶ 69} "THE TRIAL COURT HAS DEMONSTRATED BIAS AND ACRIMONY AGAINST APPELLANT AND HER COUNSEL, AND HAS VIOLATED APPELLANT'S DUE PROCESS RIGHTS."
 {¶ 70} Here, Appellant attempts to address conflicts that the trial court judge allegedly had with Appellant's counsel. First, Appellant takes issue with the trial court's commentary as to the underlying basis for Appellant's voluntarily dismissal of her complaint. Second, she takes issue with the judge's reference that Appellant may potentially pursue a legal malpractice claim against her counsel. (Dec. 22, 2005, Judgment Entry.) Finally, Appellant claims general bias on the part of the trial court judge which allegedly resulted in a denial of her due process rights. In this argument she again raises the trial court's failure to give Appellant an opportunity to respond to Appellees' motions in limine. *Page 24 
 {¶ 71} As Appellees point out, Appellant's counsel sought to have the trial court judge disqualified by the Ohio Supreme Court. In the affidavit of disqualification of the trial judge, counsel addressed the judge's accusation of legal malpractice and her alleged bias and prejudice based on race. (Aug. 2, 2005, Affidavit of Disqualification.) However, the Ohio Supreme Court found no reason to warrant the judge's disqualification. (Aug. 19, 2005, Judgment Entry.)
 {¶ 72} Hence, these issues have been addressed and overruled by the Supreme Court. As such, Appellant is barred by res judicata from raising them a second time, here. Goddard v. Children's Hosp. Med. Ctr. (2000),141 Ohio App.3d 467, 473, 751 N.E.2d 1062 (holding that the Supreme Court's dismissal of an affidavit of disqualification bars later claims on the same allegations as res judicata.) We have no choice but to hold that Appellant's arguments in this regard are without merit.
 CONCLUSIONS {¶ 73} Appellant has established that Dr. Friedman was qualified to testify as an expert, and that his deposition testimony and affidavits provided evidence relating to standard of care, breach of standard of care, and proximate cause sufficient to, at least, overcome Appellees' motions for summary judgment with respect to Appellees Dr. Gonzalez and Dr. Barringer. Appellant provided no evidence of a standard of care that may specifically apply only to Healthridge. Nevertheless, Appellant has alleged that Healthridge is liable under the theory of respondeat superior, and there appear to be questions of fact remaining as to whether this theory applies to *Page 25 
Healthridge. Therefore, summary judgment is reversed as to all three Appellees. The judgment of the trial court is reversed and this cause is remanded for further proceedings according to law and consistent with this Opinion.
Donofrio, J., concurs.
 DeGenaro, P.J., concurs. *Page 1